SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-------------------------------------------------------------------X

MALISHA BLYDEN

Plaintiff,

- against -

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT,
THE BRONX DISTRICT ATTORNEY'S OFFICE,
MANUEL D. ALAMO, "JOHN" COAKLEY,
MICHAEL DISKIN, "JOHN" MULLARKEY,
"JOHN" O'BRIAN, ANGELO POLITE,
"JOHN" REILLY, JAMES C. RUANE,
ANTHONY RUSSO, "JOHN" SCANLON,
and "JOHN" SMITH,

Defendants.

-------------------------------------------------------------------X

Plaintiff Designated
Bronx County
As the Place of Trial
The basis of venue is
Plaintiff's residence

**SUMMONS**
**Index No:**

Plaintiff Resides at:
893 Croton Park North
Bronx, New York 10460

**TO THE ABOVE NAMED DEFENDANTS:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
          June 5, 2015

KEITH D. SILVERSTEIN & ASSOCIATES, P.C.

By_____
          KEITH D. SILVERSTEIN
          *Attorneys for Plaintiff*
          40 Fulton Street, 7th Floor
          New York, New York 10038
          (212) 385-1444

To:

The City of New York
New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, New York 10007

The New York City Police Department
1 Police Plaza
New York, New York 10038

The Bronx District Attorney's Office
198 East 161st Street
Bronx, New York 10451

Manuel D. Alamo (Detective),
"John" Coakley (actual first name unknown) (Detective),
Michael Diskin (Detective),
"John" Mullarkey (actual first name unknown) (Detective),
"John" O'Brian (actual first name unknown) (Detective),
Angelo Polite (Detective),
"John" Reilly (actual first name unknown) (Detective)
James C. Ruane (Lieutenant),
Anthony Russo (Sergeant), and
"John" Scanlon (actual first name unknown) (Detective), and
"John" Smith (actual first name unknown) (Detective),
c/o
The New York City Police Department
1 Police Plaza
New York, New York 10038

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X

MALISHA BLYDEN

                                    Plaintiff,

    -  against -

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT,
THE BRONX DISTRICT ATTORNEY'S OFFICE,
MANUEL D. ALAMO, "JOHN" COAKLEY,
MICHAEL DISKIN, "JOHN" MULLARKEY,
"JOHN" O'BRIAN, ANGELO POLITE,
"JOHN" REILLY, JAMES C. RUANE,
ANTHONY RUSSO, "JOHN" SCANLON,
and "JOHN" SMITH,

                                  Defendants.

-------------------------------------------------------------------X

Index No.:

**VERIFIED COMPLAINT**

        Plaintiff, Malisha Blyden ("Blyden"), by her attorneys, KEITH D. SILVERSTEIN &

ASSOCIATES, P.C., alleges upon information and belief, as and for her Verified Complaint:

## PRELIMINARY STATEMENT

        1.      This is a civil action seeking monetary damages for Blyden due to her false arrest,

false imprisonment, malicious prosecution, wrongful prosecution, abuse of process, violation of

her civil rights under the United States and New York State Constitutions and 42 U.S.C. §§1983,

and her approximate seven-year wrongful imprisonment caused by the pervasive misconduct,

deliberate indifference, and pattern of unconstitutional behavior by subordinates of the New York

City Police Department ("NYPD") and the Bronx District Attorney's Office ("BXDA") and their

various members, servant, agents, and employees.

        2.      Blyden's conviction for attempted murder, burglary, robbery, assault, and criminal

possession of a weapon was based primarily on the false and fallacious identifications obtained by

NYPD detectives and by their failure and refusal to properly and thoroughly investigate the case. At trial, the BXDA presented no fingerprint, DNA, or other physical evidence linking Blyden to these crimes. The BXDA and the NYPD knew, should have known, or had reason to know that Blyden was innocent of the criminal charges against her, but ignored such knowledge and proceeded to try her anyway.

3.     The victim, George Peseo ("Peseo"), was actually accosted and attacked by Latreese Shufford ("Shufford") and Jacqueline Misodi ("Misodi"), both of whom gave full confessions to the BXDA in January 2014 and are awaiting trial in the Bronx Supreme Court – Criminal Term (Case No: 02920-2014).

4.     Blyden's conviction by jury on June 11, 2007 was overturned on January 16, 2014 by Justice Ethan Greenberg, who ordered that the conviction be vacated and that Blyden be freed from prison. The application was joined by the BXDA based on exculpatory evidence that had been withheld and that could and should have been uncovered and disclosed during the course of the investigation and underlying criminal proceedings. The indictment was ordered dismissed with prejudice on March 11, 2014.

5.     This lawsuit seeks to hold defendants City of New York ("City"), NYPD, BXDA, and their various members, servants, agents, and employees liable for the above misconduct under the federal civil rights statute, 42 U.S.C. §1983, *et. seq.*; New York State common law; the New York State Constitution; and *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). The unlawful actions of police detectives, prosecutors, and other various members, servants, agents, and employees of NYPD and BXDA documented in this lawsuit resulted from affirmative practices and customs that resulted in violation of the constitutional rights of criminal suspects and defendants and Blyden in particular; and from deliberate indifference by policy-making officials,

acting on behalf of the City and BXDA to such violations. The NYPD, through their use of intimidation, duress, coercion, and unreasonable deception, and their powers of arrest and interrogation, coerced Latisha Johnson ("Latisha")---a co-defendant with Blyden in the underlying criminal case, who also was convicted of the same criminal charges and eventually exonerated---into giving a false and unreliable confession in which she implicated Blyden in the underlying criminal charges. Furthermore, the BXDA, knowing full well that Johnson's so-called "confession" contained more than enough irregularities that they decided not to introduce it at trial, nonetheless prosecuted Blyden anyway, thereby wrongfully prosecuting her. Blyden would not have been convicted at all but for the police and the trial prosecutor's misconduct. This lawsuit seeks to hold liable the police detectives, as well as the City, NYPD, and BXDA pursuant to *Monell v. Dept. of Social Services, supra*, 436 U.S. 658, because the deliberate indifference of the BXDA, as policymaker for the City, was a substantial cause of the prosecutor's misconduct, which in turn, caused Blyden's constitutional injuries.

6. Based on the egregious conduct by defendants in the underlying criminal case, Blyden was arrested when she was 22 years old and spent approximately seven years incarcerated for a crime she did not commit. By the time of her exoneration and release, she was 31 years old. She was labeled as a violent felon and wrongly held under prosecution for more than two years before her wrongful conviction. The resulting damages to Blyden are myriad and extraordinary, including the wrongful loss of her freedom during crucial child-bearing years, the loss of her relationship with her parents, and physical injuries suffered while wrongfully incarcerated. Blyden therefore seeks to hold defendants accountable for their reprehensible conduct, and seeks compensation for the emotional, mental, and physical pain, suffering, and loss caused by wrongfully being incarcerated in prison for seven years.

## **THE PARTIES**

7.      At all relevant times, Blyden resided, and still resides, in the County of Bronx, City and State of New York.

8.      At all relevant times, the City was, and still is, a duly licensed municipal corporation organized and existing under and by virtue of the laws of the State of New York.

9.      At all relevant times, NYPD was, and still is, a duly licensed municipal corporation organized and existing under and by virtue of the laws of the State of New York.

10.      At all relevant times, the City maintained, and still maintains, a police force, known as NYPD, which was, and still is, operated under the supervision and control of the City.

11.      At all relevant times, BXDA was, and still is, a governmental agency authorized to prosecute crimes occurring in the County of Bronx, State of New York, with its principal headquarters located in the County of Bronx, City and State of New York.

12.      At all relevant times, Detective Manuel D. Alamo ("Alamo") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment. He is sued in his individual and his official capacities.

13.      At all relevant times, Detective "John" Coakley (actual first name unknown) ("Detective Coakley") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment. He is sued in his individual and his official capacities.

14.      At all relevant times, Detective Michael Diskin ("Detective Diskin") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes,

ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

15.     At all relevant times, Detective "John" Mullarkey (actual first name unknown) ("Detective Mullarkey") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

16.     At all relevant times, Detective "John" O'Brian (actual first name unknown) ("Detective O'Brian") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

17.     At all relevant times, Detective Angelo Polite ("Detective Polite") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

18.     At all relevant times, Detective "John" Reilly (actual first name unknown) ("Detective Reilly") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

19.     At all relevant times, Lieutenant James C. Ruane ("Lieutenant Ruane") was a police officer employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

20.     At all relevant times, Sergeant Anthony Russo ("Sergeant Russo") was a police officer employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

21.     At all relevant times, Detective "John" Scanlon (actual first name unknown) ("Detective Scanlon") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

22.     At all relevant times, Detective "John" Smith (actual first name unknown) ("Detective Smith") was a detective employed by the NYPD; acted toward Blyden under color of the laws, statutes, ordinances, customs, and usage of the State of New York and the City; and acted within the scope of his employment.  He is sued in his individual and his official capacities.

## PLAINTIFF'S COMPLIANCE WITH THE STATUTORY PREREQUISITES TO COMMENCEMENT OF THIS LAWSUIT

23.     On March 14, 2014, and within 90 days of the happening of the events that give rise to this action, plaintiff's Notice of Claim, which stated the time when and place where Blyden's injuries were sustained, was duly served on the defendants and filed with the Comptroller of the City.

24.     A hearing of Blyden pursuant to General Municipal Law §50-h was duly held, pursuant to notice, on January 29, 2015.

25.     At least 30 days have elapsed since the demands or claims on which this action is predicated were presented to the Comptroller of the City for adjustment or payment thereof, on behalf of the City, the NYPD, and the BXDA, but the City has neglected and/or refused to make an adjustment or payment thereof for said period of 30 days after such presentations.

26.     This action is commenced within 1 year and 90 days after the happening of the events upon which the claims are based.  Blyden has complied with all necessary requirements before instituting this action.

27.     This limitations on liability set forth in New York C.P.L.R. §1601 do not apply to this action.

## FACTUAL ALLEGATIONS

## THE CRIME

28.     The underlying criminal case involved the home invasion robbery and shooting of Peseo, which occurred in the early morning hours of Tuesday, September 6, 2005.

29.     It was later determined that these crimes were committed by a group of five men and two African-American women.

30.     Shufford and Misodi---who at the time of the crimes were approximately sixteen years old and working for their pimp, Jonathan Casanova ("Casanova") in a three-bedroom apartment in Harlem----ultimately confessed to being these two women.

31.     Peseo had spent much of the preceding Labor Day weekend with the two African-American women, whom he apparently had met while driving his green Ford Expedition near the Polo Grounds Housing Project in Manhattan (the "Polo Grounds") on Sunday, September 4, 2005. Peseo picked the women up and brought them back to his apartment in the Bronx, where he eventually had sex with one of them.  The two women spent the night at Peseo's apartment.

32.     The two women (who were known to their associates as "Jackie" and "Lace") often spent time at an apartment in the Polo Grounds with Casanova, and often performed sexual favors for money, in transactions that were supervised or arranged by Casanova.

33.    The apartment where Casanova, Jackie, and Lace spent time was the home of a couple, Mario Nogueira ("Nogueira") and Jasmine Dalton ("Dalton"), who, in turn, rented one room in the apartment to a man named Terrell Davis ("Davis") and another to a woman named Shermaine Maitland ("Maitland"). Davis began to bring Casanova around the apartment, along with two other friends named Kashawn Rowson ("Rowson") and Jeffery "Corrupt" Graves ("Graves").

34.    On September 5, 2005, Jackie and Lace returned from Peseo's apartment to the Polo Grounds apartment. They suggested to Casanova and the others that Peseo might be a good target for a robbery. Casanova, Davis, Rowson, and Corrupt decided to rob Peseo.

35.    On the night of September 5, 2005, Jackie and Lace returned to Peseo's apartment. They demanded money from him, but he refused. While they were at Peseo's apartment, Jackie and Lace used his cell phone to make outgoing calls. Peseo then called his friend, Frank Nti ("Nti") and asked Nti to come to the apartment, which Nti did. Jackie and Lace then used Nti's cell phone. Subsequently, the women left Peseo's apartment in a taxi.

36.    In the early morning hours of September 6, 2005, Jackie and Lace returned to Peseo's building and buzzed up to his apartment. Peseo opened the door and was rushed by a group of men, who were accompanied by Jackie and Lace. The group ransacked Peseo's apartment, filling trash bags with his belongings. They then bound him with duct tape, and one of the men shot him in the stomach and chest and left him for dead. The group loaded up Peseo's truck with his stolen belongings and returned to the Polo Grounds apartment.

37.    Peseo was able to free himself and run out of the apartment. He was taken to the hospital in an ambulance and subsequently underwent a series of surgeries. He survived the shooting.

38.     On September 5, 2005, while Peseo was patronizing Jackie and Lace, Blyden was at her home, a location not near and unrelated to Peseo's apartment.

39.     On September 6, 2005, during the robbery and shooting, Blyden was at her home, a location not near and unrelated to the scene of the crime.

40.     Blyden had absolutely no involvement in the crime and no possible connection to any of the perpetrators.

## THE INVESTIGATION

41.     Responding to the scene, Detectives Alamo and Polite interviewed eyewitnesses who had seen and interacted with the real perpetrators.  Two witnesses, who were standing outside the building during the assault, reported that a group entered the building while a Hispanic man waited outside.  They further reported that at one point a short, thin woman came out to ask the Hispanic man for a cigarette.  This description did not match either Latisha or Blyden.

42.     Both witnesses also reported that the short, thin woman used the alarm button to find a Ford Expedition on the street, which the Hispanic man drove in front of the building.  The witnesses saw the group load the car up with plastic bags, a television, and a computer.  A few minutes after the group drove away in the Ford, witnesses saw Peseo come out of the building, asking for help because he had been shot.

43.     At approximately 7:45 a.m., on the morning of September 6, 2005, Detectives Smith and Scanlon went to Peseo's apartment to speak with Alamo and Polite, who initially responded to the 911 call and processed the crime scene.

44.     Detectives Smith and Scanlon then went to the hospital to try to interview Peseo regarding the incident.  However, due to his then grave medical condition, he could not answer

questions, except to say that he owned a green Ford Expedition and that he knew who had shot him.

45.     Later that day, Detectives Smith, Diskin, and Reilly interviewed Nti at the 44th Precinct in the Bronx.  The Detectives learned from Nti that he had met two African-American girls at Peseo's apartment the afternoon before the shooting and that he knew the two girls had a connection to the Polo Ground Housing Project in Harlem.  He also told the Detectives that he had witnessed an argument between the two girls and Peseo in the apartment that night and that one of the girls had used Peseo's cell phone to call an unknown man.  Peseo did not know Blyden at this time.

46.     Nti was asked to view photographs from the New York City Police Photo Manager System, but was unable to identify anyone.

47.     That evening, Detectives Smith and Reilly canvassed the area around the Polo Grounds with Nti.  They found Peseo's green Ford Expedition parked on West 155th Street between Frederick Douglas Boulevard and Harlem River Drive.

48.     Later that evening, Detectives Smith and Scanlon spoke with Elizabeth Mendez ("Mendez"), a friend of Peseo's, who corroborated everything Nti had already told the police. Nothing said or uncovered implicated Blyden in any crime as of this point.

49.     During the following days, Detective Smith kept hitting dead ends in the investigation, and Peseo was still in the hospital, unable to be interviewed due to his medical condition.  It was not until September 19, 2005 that Detective Smith was able to interview Peseo. Peseo confirmed everything the police had learned from the other witnesses: that Peseo had picked up two African-American girls at the Polo Grounds and drove them back to his apartment in the

Bronx, and that while he was with the girls, he had allowed them to use his cell phone to make calls.

50.     A few days after interviewing Peseo, Detective Smith received call records from both Peseo and Nti, which he hoped would enable him to identify calls made from the phone by the perpetrators.  When he examined the phone records, he noticed that on September 6, 2005 after 5:00 a.m. phone calls to three different numbers had been made.  Peseo could not have made these calls as he was already undergoing surgery.  Detective Smith then requested the subscriber information and caller identification detail for all three numbers.

51.     Before he received the subscriber information for the three numbers, Detective Smith returned to the hospital to interview the heavily-medicated Peseo.  Thus, while Peseo was still in the hospital on heavy doses of morphine that he later admitted clouded his thinking, Detective Smith asked Peseo to point out any unfamiliar numbers on the list of outgoing calls.  He identified a phone number he did not recognize, which the police later learned was registered to Tyrone Johnson ("Mr. Johnson"), Latisha's father.

52.     The call to Mr. Johnson was not made by Jackie or by Lace, however.  It was made by Peseo.  Mr. Johnson's phone number was identical to one that, according to subsequently unearthed records, Peseo often called; the only difference was that the final digit was a 2, rather than a 1.  The call to Mr. Johnson lasted less than one minute and was made after Jackie and Lace left Peseo's apartment on September 5, 2005, and before they returned on September 6, 2006.  In other words, Peseo called Mr. Johnson's phone number by accident, intending to call a similar number that belonged to someone with whom he frequently spoke on the phone, then immediately hung up when he realized the error.

53.     Nonetheless, after Peseo told the police that the number looked unfamiliar, the police decided to investigate Latisha anyway, because she was around the age of Jackie and Lace. They prompted Peseo to identify Latisha from a photo array, which incredulously was not recorded or administered by a neutral party.

**THE ARREST AND TRIAL**

54.     Blyden was riding the subway with Latisha on October 11, 2005, when a transit officer pulled them off the train for playing music too loudly on a cellphone.  Blyden was shocked when the officer ran the women's identification and revealed that Latisha was wanted for questioning by the police.

55.     Latisha subsequently disappeared into a 22-hour interrogation.  By the time she emerged, she had confessed to having a role in the aforementioned crimes, and she had implicated Blyden, even though both women were innocent of any such crimes.

56.     Latisha's "confession" was fabricated by the police.  It contained numerous details about the crime that were demonstrably false.  The police provided Latisha with details about Peseo's shooting---which Latisha could not have known, because she was not involved---and then coerced Latisha to give a "confession" that conformed to their theory of the case.

57.     Within one day, because of her "close association" with Latisha and a fabricated photo identification, Blyden was arrested and criminally charged in connection with the Peseo shooting.

58.     Based on the telephone records and a series of patently unreliable and false witness identifications, Blyden was indicted on March 15, 2006 for attempted murder, burglary, assault, and criminal possession of a weapon.

59.     Blyden's trial began on May 7, 2007.  During the prosecution's case, various witnesses identified Blyden and Latisha as "Jackie" and "Lace."  These false identifications were implausible on their face, and in some instances were so inaccurate and imprecise that the witnesses' apparent confusion and long pauses were preserved in the record.

60.     Knowing it was unreliable, the prosecution did not adduce Latisha's "confession" into evidence during the trial.  Prosecutors did rely, however, on perjured testimony from "witnesses"---accomplices to the shooting who cut deals with prosecutors for their cooperation--- who had been coaxed into identifying (with much equivocation) Blyden and Latisha.

61.     The prosecution also relied on the telephone records of the call from Peseo's phone to Mr. Johnson's phone.  However, for most of the trial, Blyden's attorney was provided only with heavily redacted records of Peseo's outgoing calls.  It was only when the trial was nearing its conclusion, and the defense had already called multiple witnesses, that the prosecution released the unredacted records.  Only then did the defense learn that Peseo had made numerous calls to a number one digit off from Mr. Johnson's, including at times when the perpetrators indisputably had no access to the phone.  By then, it was too late to effectively challenge the prosecution's case. Even as the court noted that the records were "exculpatory material" that was "in the nature of *Brady*," it refused to grant a mistrial.

62.     On June 11, 2007, the jury convicted Blyden of attempted murder in the second degree, burglary in the first degree, robbery in the first degree, assault in the first degree, and criminal possession of a weapon in the second degree.

63.     On December 2, 2008, Blyden was sentenced to concurrent terms of 25 years imprisonment for attempted murder, 15 years imprisonment for the assault and for each of the two burglary convictions, and 5 years imprisonment for weapons possession.  She was also sentenced

to 15 years on each of the two robbery counts, with the robbery sentences to run concurrently with each other and consecutively to the attempted murder sentence. Thus, the aggregate term of her sentence was 40 years in prison.

64. Blyden appealed her conviction, and the Appellate Division, First Department affirmed unanimously, *People v. Blyden*, 83 A.D.3d 542 (1st Dept. 2011), *leave to appeal denied*, 17 N.Y.3d 857 (2011).

65. Blyden then petitioned for a writ of habeas corpus pursuant to 28 U.S.C. 2254. *Blyden v. Superintendent*, No. 12 Civ. 8996 (S.D.N.Y.). That petition was dismissed as moot after Blyden was exonerated and released from prison.

## BLYDEN'S EXONERATION

66. Notwithstanding the concocted NYPD "investigation", Peseo's shooting was not competently investigated until after Blyden and Latisha had already spent years in prison. That proper investigation was not done by the police; it was done by appellate counsel, who located witnesses with information about how the crime had actually happened and tracked down a female accomplice of the actual perpetrators.

67. In 2012 and 2013, appellate counsel for Blyden and Latisha reinvestigated the case. They uncovered numerous irreconcilable problems with the case against Blyden and Latisha, and assembled proof of their innocence that was incontrovertible. In particular, counsel learned that Shufford was "Lace." After numerous witnesses confirmed that Shufford was the true Lace, counsel presented their findings to the BXDA's office, which agreed to perform its own reinvestigation.

68.     In the course of the BXDA's reinvestigation, four witnesses, including Nogueira and Maitland (both of whom had testified for the prosecution at trial and identified Blyden), identified photographs of Shufford as the true Lace.

69.     On January 14, 2014, the BXDA's office interviewed Shufford. She confessed to her involvement in the Peseo shooting and admitted that she was the true Lace. Her confession was further corroborated by her photo identification of Graves, Rowson, Casanova, and Davis as the male perpetrators.

70.     From Shufford's statements, the BXDA's office learned that "the actual identity of Jackie was a woman named Jaqueline Misodi", not Blyden. On January 17, 2014, the BXDA's office interviewed Misodi, who gave a detailed and well-corroborated confession.

71.     On January 16, 2014, the New York Supreme Court, Bronx County, vacated Blyden's conviction with the consent of the BXDA's office pursuant to C.P.L. §440.10. In open court, the BXDA's office stated: "...that the amount of exculpatory evidence that has been uncovered by both the defense and by us warrants that we consent to this motion...[W]e are consenting to the grant of vacatur of the convictions of both these defendants and in addition, given the evidence that we believe points to their innocence we are joining their application for an immediate release of the defendants from prison..." Blyden was released from prison.

72.     The indictment against Blyden was formally dismissed on March 11, 2014. The dismissal of all criminal charges against Blyden constituted a termination of the criminal action in Blyden's favor.

## PLAINTIFF'S INJURIES AND DAMAGES

73.     As a direct and proximate consequence of the aforementioned events, Blyden spent more than two years under prosecution and/or awaiting trial following her October 2005 arrest, and was detained in Rikers Island from April 23, 2007 until December 2, 2008, when she was sentenced.  She remained incarcerated in State prison until her release on January 16, 2014.

74.     As a result of her wrongful incarceration, Blyden suffered and continues to suffer from severe physical injuries and pain.  Blyden injured her back.  She also injured her right hand, causing nerve damage and numbness.  She has received, and currently receives, physical therapy for these injuries.

75.     Blyden also suffered severe emotional and mental anguish and pain as a result of being accused of and punished for crimes she did not commit.  She was denied effective treatment for her emotional injuries while incarcerated, and continues to suffer mental anguish to this day. She was imprisoned for much of her twenties, unable to establish a career, an education, or a family of her own.  She has received, and currently receives, care and treatment for her emotional and psychological pain and suffering.

76.     Blyden was denied the opportunity to pursue normal relationships with, and to enjoy the companionship of, family members and friends.  She lost the support, society, and companionship of her parents, and her relationship with them remains significantly deteriorated and strained.

77.     Blyden was denied years of gainful employment and income. Her earning power and ability to support herself have been permanently hampered by the years of productive work experience her wrongful imprisonment denied her.

78.     Blyden has been publicly shamed, disgraced, ridiculed, and humiliated.  Nothing can undo the reputational damage she has sustained.

79.     Blyden was denied fundamental constitutional rights and has lost much of her faith in the American justice system.

80.     Blyden was also falsely arrested, maliciously prosecuted, and unjustly convicted for attempted murder, burglary, robbery, assault, and criminal possession of a weapon, and was wrongfully sentenced to 40 years in prison, suffering loss and deprivation of her liberty and freedom for approximately seven years, until she was fully and finally exonerated by the court of all crimes.

81.     Blyden also suffered past and future physical illnesses and injuries as a result of her wrongful conviction and her experiences in prison.

82.     Blyden also suffered past and future mental and emotional injuries, pain and suffering, as a result of her wrongful conviction and her experience in prison.

83.     Blyden also suffered loss of enjoyment of life, as a result of her wrongful conviction and her experience in prison.

84.     Blyden also suffered violation of her civil rights, as a result of her wrongful conviction and her experience in prison.

## AS AND FOR A FIRST CAUSE OF ACTION
### <u>False Arrest and Malicious Prosecution Under State Law</u>

85.     Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

86.     By virtue of the foregoing, the individual defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Blyden.

87.     Blyden's arrest and custody was without probable cause.

88.     Notwithstanding the obtaining of an indictment in this matter, the arrest and prosecution was void from the outset, as the defendants had no probable cause to arrest and detain Blyden.

89.     The obtained indictment was tainted by the presentation of false, misleading, and incomplete evidence as well as by the withholding of exculpatory evidence.

90.     The criminal proceedings terminated in Blyden's favor.

91.     There was no probable cause for the commencement or for the continuation of the criminal proceedings, yet the defendants continued the prosecution of Blyden.

92.     The defendants acted with actual knowledge of the baselessness of the prosecution and acted with actual malice.

93.     Alternatively, the defendants acted with deliberate and reckless indifference and disregard to the truth.

94.     Blyden was falsely arrested without reason or probable cause, prosecuted, and wrongfully incarcerated.  Her claims against the City arise out of its conduct and that of the NYPD, the BXDA's office, and their agents, servants, and employees, in investigating, detaining, prosecuting, and imprisoning Blyden in connection with the above mentioned indictment. Employees of the City and the NYPD were all acting within the scope of and in the course of their employment, when they failed to follow proper police procedures; conducted improper investigations; conducted improper identifications; used improper interrogation techniques; improperly influenced witnesses to provide false statements and testimony; suborned false testimony; failed to follow up on evidence that was exculpatory; and concealed exculpatory evidence, all leading to the false arrest, malicious prosecution, and false imprisonment of Blyden.

95.     The damages and injuries sustained herein were sustained as a result of the aforementioned conduct and the subsequent improper conduct of the BXDA's office in concealing exculpatory evidence, improperly influencing witnesses to give false testimony, suborning testimony knowing it to be false, and wrongfully pursuing the prosecution without good cause.

96.     The individual defendants all acted under color of State law at the time of their actions.

97.     The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

98.     The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

99.     The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

100.    By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A SECOND CAUSE OF ACTION
## Infliction of Emotional Distress Under State Law

101.    Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

102.    Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Blyden at least until her release from prison in January 2014.

103.    Defendants engaged in that pattern of conduct with intention to cause or in reckless disregard of the substantial probability that it would cause Blyden severe emotional distress.

104.    Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative or administrative capacity, coerced Latisha into falsely confessing to the crime and implicating Blyden as a participant in the crime; coerced witnesses into making false identifications to be used against Blyden; created false official records to be used against Blyden; caused the detainer and imprisonment of Blyden, and through their intimidation, duress, coercion, unreasonable deception, arrest, and unconstitutional interrogation intentionally inflicted emotional distress upon Blyden.

105.    Blyden suffered severe emotional distress as a result of, and that was proximately caused by the defendants' aforementioned actions.

106.    By virtue of the foregoing, the individual defendants, acting in concert with each other and with additional persons.

107.    The individual defendants all acted under color of State law at the time of their actions.

108.    The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

109.    The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

110.    The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

111.    By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint,

and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A THIRD CAUSE OF ACTION
### Malicious Prosecution Under 42 U.S.C. §1983, 14th and 4th Amendments

112.    Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

113.    Defendants, with malice and without probable cause, while all acting individually and in concert, did arrest and aided in the prosecution of Blyden for attempted murder, burglary, robbery, assault, and criminal prosecution of a weapon, and caused her to be arrested and prosecuted for the aforementioned crimes, violating Blyden's constitutional rights.

114.    Defendants, with malice and while acting individually and in concert, intentionally and knowingly misrepresented the truth and withheld exculpatory evidence from the grand jury.

115.    Defendants, with malice and while acting individually and in concert, knew or should have known, with deliberate reckless indifference to the truth, that probable cause did not exist to arrest or prosecute Blyden due to, but not limited to the fact that Latisha's statements allegedly implicating Blyden were not a product of Latisha's free will, and that evidence had been fabricated by the defendants, and that defendants did not disclose this or any exculpatory or impeachment evidence to the grand jury or prosecutors.

116.    The individual defendants performed the above-described acts while acting under the color of state law, deliberately, intentionally, and recklessly disregarding the truth and Blyden's rights with malice.

117.    Blyden was and is actually innocent of the aforementioned crimes of attempted murder, burglary, robber, assault, and criminal possession of a weapon.

118.    Prosecution was terminated in Blyden's favor on March 11, 2014 by dismissal of the indictment with prejudice.

119.    The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

120.    The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

121.    The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

122.    By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violation of Plaintiff's Due Process Rights Under
### 42 U.S.C. §1983, 14th and 4th Amendments

123.    Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

124.    Defendants, acting individually and in concert, failed to investigate evidence they knew or should have known, or through deliberate and reckless indifference, was exculpatory for Blyden's prosecution.

125.    These failures included, but are not limited to, failing to fully investigate the numbers dialed post-shooting of Mr. Peseo, and waiting to properly interview Maitland until directed to do so by the Assistant District Attorney.

126.   Blyden was and is actually innocent of the crimes of attempted murder, burglary, robbery, assault, and criminal possession of a weapon.

127.   Even without probable cause, Blyden was held until arraignment and then remanded again in April 2007 until March 2014.

128.   Defendant officers and detectives', and their supervisors', failure to properly investigate and failure to investigate available exculpatory evidence deprived Blyden of her constitutional rights.

129.   Defendants did this without probable cause, in violation of Blyden's constitutional rights with conduct no reasonable officer would have believed was lawful.

130.   The defendant officers performed the above-described acts while acting under the color of state law, deliberately, intentionally, and recklessly disregarding the truth and Blyden's rights with malice.

131.   Defendants coerced and induced Blyden to falsely confess to the crime.

132.   Defendants proceeded with the arrest and prosecution of Blyden even though they knew that they had no probable cause and insufficient credible and reliable evidence with which to obtain a conviction.

133.   Due to the defendants' wrongful conduct, Blyden was maliciously prosecuted, wrongfully convicted, and wrongfully imprisoned for approximately seven years.

134.   The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

135.   The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

136.   The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

137.   By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

### AS AND FOR A FIFTH CAUSE OF ACTION
### Claims Under 42 U.S.C. §1983 Civil Rights Conspiracy

138.   Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

139.   Defendant detectives and officers, acting within the scope of their employment and under the color of law, agreed amongst themselves and with others to act in concert in order to deprive Blyden of her constitutional rights.

140.   Defendants, in furtherance of the conspiracy, engaged in conduct, including but not limited to, the misrepresentation of false identifications of Blyden and withholding of exculpatory evidence from the grand jury and prosecutor.

141.   Due to the defendants' wrongful conduct, Blyden was maliciously prosecuted, wrongfully convicted, and wrongfully imprisoned for approximately seven years.

142.   The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

143.   The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

144.   The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

145.     By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Negligent Hiring, Training, and Supervision Under State Law, City of Canton v. Harris, and 42 U.S.C. §1983

146.     Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

147.     Defendant supervisors, acting toward Blyden under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acting within the scope of their employment, know or should have known that their subordinate officers had deprived Blyden of her constitutional rights through their subordinates' gross misconduct that included, but was not limited to coercing and causing a false confession, deliberately ignoring exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) ("Brady"), failing to properly investigate, causing deliberate false identifications of Blyden in violation of her Due Process Rights and their ongoing affirmative duty to come forward with evidence of innocence and the truth of their illegal misconduct.

148.     Defendant supervisors, by failing to supervise their subordinate officers and by their active participation in the facilitation of this conduct, and by depriving Latisha of her constitutional right against self-incrimination, resulting in Latisha's implication of Blyden in connection with the abovementioned crimes.

149.     Defendant supervisors permitted their subordinates to act with license as they wished and without proper supervision, discipline or training, and in an environment that their

subordinates knew that their violations of Blyden's constitutional rights would be facilitated, approved, and/or condoned by their supervisors.

150.    Defendant supervisors acted in a way that no reasonable supervisor would believe was lawful.

151.    The City, the NYPD, and the BXDA failed to properly hire, train, and supervise their employees in general and those specifically involved with Blyden's case; failed to take proper steps to ensure that their employees were aware of citizens' and Blyden's constitutional rights and of their obligations under the constitutions of the United States and the State of New York; and failed to properly train and supervise their employees in the handling of exculpatory evidence, the taking of confessions, the securing and pursuit of evidence, and in proper and legal police procedure.

152.    Due to the defendants' wrongful conduct, Blyden was maliciously prosecuted, wrongfully convicted, and wrongfully imprisoned for approximately seven years.

153.    The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

154.    The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

155.    The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

156.    By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### *Monell* Claim against City of New York Under 42 U.S.C. §1983

157.   Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

158.   The City directly caused the constitutional violations suffered by Blyden, and is liable for the damages suffered by her, as a result of the conduct of the defendant officers, which was a direct consequence of policies and practices of the City.

159.   At all times relevant to this complaint, the City, acting through the NYPD, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual defendants, and were a direct and proximate cause of the damages and injuries complained of herein.

160.   At all times relevant to this complaint, the City, acting through the NYPD, had in effect policies, practices, and customs and usages of encouraging and/or tacitly sanctioning the violation of citizens' constitutional rights including but not limited to policies, practices, and customs of conducting constitutionally deficient investigations; physically, psychologically, improper interrogations of witnesses, suspects, and arrestees in order to obtain coerced and fabricated confessions.

161.   The City failed to supervise its officers and detectives in conducting constitutionally sound investigations, ensuring the proper protocols and constitutional due process requirements were followed to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted.   Officers were aware that the supervision was lax and therefore they were free to deviate from the norms and requirements of law and decency.

162.   The existence of these unconstitutional customs and policies, specifically as it relates to interrogations and confessions, is evidenced by the countless repeated occurrences of similar exonerations based on false confessions over the past ten years.

163.   As a result of the above described policies and customs, officers of the City, including the defendant officers and detectives believe that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

164.   Due to the defendants' wrongful policies, practices, customs, and/or usages complained of herein, demonstrated a deliberate indifference on the part of policymakers of the City of New York to the constitutional rights of persons within the City, and were the proximate cause of Blyden's malicious prosecution, wrongful conviction, and wrongful imprisonment for almost seven years.

165.   By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Failure to Intercede Under 42 U.S.C. §1983

166.   Blyden repeats and re-alleges each and every one of the preceding allegations set forth in this Complaint.

167.   Defendants acting toward Blyden under color of the law, statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acting within the scope of their employment, had a multitude of opportunities to intercede on behalf of Blyden and

to prevent the violation of her constitutional rights, but declined or refused to do so. These refusals were a direct violation against Blyden's Fifth Amendment rights.

168.    No reasonable prosecutor, officer, detective, or supervisor would have believed that these refusals and failures to intercede were lawful.

169.    Due to the defendants' conduct, Blyden was maliciously prosecuted, wrongfully convicted, and wrongfully imprisoned for approximately seven years.

170.    The City is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

171.    The NYPD is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

172.    The BXDA is liable under the principle of *respondeat superior* for the actions of the named individual defendants.

173.    By reason of the foregoing, Blyden was damaged and sustained personal, physical, and emotional injuries, and all of the damages and injuries set forth in ¶¶73-84 of the Complaint, and is entitled to monetary damages in an amount that exceeds the jurisdictional limitations of all lower courts that would otherwise have jurisdiction.

**WHEREFORE**, Blyden demands judgment against the defendants on all causes of action set forth herein each in a sum that exceeds the jurisdiction of all lower courts, together with punitive damages and legal fees and the costs and disbursements of this action.

Dated:      New York, New York
               June 5, 2015

_____

KEITH D. SILVERSTEIN & ASSOCIATES, P.C.
*Attorneys for Plaintiff*
*MALISHA BLYDEN*
40 Fulton Street, 7th Floor
New York, New York 10038
(212) 385-1444

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X

MALISHA BLYDEN

                                    Plaintiff,            **Index No:**

        -   against -                                     ATTORNEY
                                                          VERIFICATION

THE CITY OF NEW YORK,
THE NEW YORK CITY POLICE DEPARTMENT,
THE BRONX DISTRICT ATTORNEY'S OFFICE,
MANUEL D. ALAMO, "JOHN" COAKLEY,
MICHAEL DISKIN, "JOHN" MULLARKEY,
"JOHN" O'BRIAN, ANGELO POLITE,
"JOHN" REILLY, JAMES C. RUANE,
ANTHONY RUSSO, "JOHN" SCANLON, and
"JOHN" SMITH,

                                    Defendants.

-------------------------------------------------------------------X

        KEITH D. SILVERSTEIN, an  attorney duly admitted to the practice of law before the
courts of the State of New York, affirms the truth of the following statements, made upon
information and belief, under the penalties of perjury, pursuant to C.P.L.R. §2106.

        I am the attorney of record for the plaintiff herein.  I have read the foregoing complaint and
know the contents thereof; the same is true to my own knowledge except as to the matters therein
stated to be made upon information and belief and as to those matters, I believe them to be true.
This verification is made by me and not by the plaintiff because she does not reside in the County
of New York, which is the county in which I maintain my office.

        The grounds of my belief as to all matters not stated to be upon my own knowledge are
correspondence and communications had with the plaintiff, information contained in my office
file, and documents supplied by the plaintiff and other pertinent date and materials relating thereto.

Dated: New York, New York
       June 5, 2015

                        **KEITH D. SILVERSTEIN & ASSOCIATES, P.C.**


                    By_____
                        KEITH D. SILVERSTEIN